**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| SMARTLINX SOLUTIONS, LLC,<br><br>       Plaintiff,<br><br>v.<br><br>VITZESLAV ZEIF,<br><br>       Defendant. | **Civil Action No. 2:21-cv-711-BHH**<br><br>**VERIFIED AMENDED COMPLAINT FOR TEMPORARY AND PERMANENT INJUNCTIVE AND OTHER RELIEF** |

Plaintiff SmartLinx Solutions, LLC ("SmartLinx" or "Plaintiff"), by way of this Amended Complaint against Vitzeslav Zeif ("Zeif"), alleges as follows:

### NATURE OF THE ACTION

1.     This is an action by SmartLinx for temporary, preliminary and permanent injunctive relief, as well as compensatory, consequential, punitive damages and legal fees associated with Zeif's misappropriation of SmartLinx's proprietary and confidential business information and trade secrets in order to unfairly compete against SmartLinx in the employee workforce management industry.

2.     Zeif's unlawful competitive efforts constitute violations of the Defend Trade Secrets Act ("DTSA") (18 U.S.C. § 1839, *et seq.*); the Computer Fraud and Abuse Act ("CFAA") (18 U.S.C. § 1030(a)(4)); the South Carolina Trade Secrets Act ("SCTSA") (S.C. Code § 39-8-20, *et seq.*); and the common law of the State of South Carolina.

3.     SmartLinx will suffer irreparable harm in the event that Zeif is not immediately and permanently enjoined from the use and misappropriation of SmartLinx's confidential and proprietary business information and trade secrets.

## THE PARTIES

4.    SmartLinx is a New Jersey limited liability company providing workforce management and scheduling solutions in the long-term care and nursing marketplace. SmartLinx conducts its principal management operations (including information technology and human resources) in Iselin, New Jersey.  SmartLinx provides workforce management and scheduling solutions throughout the United States, by developing software that companies use to oversee employee operations and to maximize efficiency in scheduling and staffing.

5.    Zeif is the former Director of Product Management of SmartLinx, residing at 1420 Gemstone Blvd., Hanahan, South Carolina 29410.

## JURISDICTION AND VENUE

6.    This Court has subject matter jurisdiction pursuant to 18 U.S.C. §§ 1030(g)) & 1836(c).

7.    Venue is appropriate in this District, pursuant to 28 U.S.C. § 1391, because Zeif is domiciled in Hanahan, South Carolina.

8.    Venue is also proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims alleged herein arose in this District. Venue is also proper under 28 U.S.C. § 1391(c)(2) because Zeif is subject to the Court's personal jurisdiction with respect to the civil action in question.

9.    This action arises under 15 U.S.C. §1051, *et seq.*, and under common law.

## FACTS COMMON TO ALL COUNTS

**A.    Plaintiff SmartLinx**

10.    For the past twenty (20) years, Plaintiff SmartLinx, has become a brand name as an innovator of workforce management solutions, from scheduling and time and attendance to

payroll and compliance in the post-acute and long-term care markets, including, but not limited to, nursing homes and assisted and independent living facilities. SmartLinx has an established national presence through its scheduling application, which is well known and widely used in the market.

11.    SmartLinx distinguishes itself from other workforce management companies through its innovative scheduling products and software – Time and Attendance (TA) and Schedule Optimizer (SO), with the latest scheduling version including a feature called "Ideal Schedule."

12.    Over the last twenty (20) years, SmartLinx has expended millions of dollars in research, development and implementation of the scheduling software technology, including TA and SO.

13.    This scheduling technology is at the heart of Plaintiff's competitive edge in the marketplace, generating a significant part of Plaintiff's revenue. More than half of SmartLinx's annual revenue is derived from this technology.

14.    This technology, and particularly the recently implemented and trademarked Ideal Schedule feature, was designed to support the unique regulatory and complex scheduling needs of the long-term care and nursing industry. The technology provides SmartLinx a comprehensive plan of a facility's scheduling needs based on certain criteria, which is unrivaled in the industry and affords SmartLinx a competitive advantage over its competitors.

15.    The Affordable Care Act requires nursing facilities to electronically submit certain staffing information (including outside agency and internal contract staff) based on payroll and other data. The data, when combined with census information, can then be used to

report on the level of staff in each nursing home, as well as employee turnover and tenure, which can impact the quality of care delivered.

16.     The Centers for Medicaid and Medicare ("CMS") has developed the Payroll Based Journal ("PBJ") which requires staffing information to be accurately collected on a regular and more frequent basis.

17.     The SmartLinx scheduling software allows a facility to properly track its staff hours and generate invoices, among other things, in compliance with CMS guidelines.

18.     The SmartLinx Ideal Schedule feature reviews the census level at a nursing facility and creates an ideal schedule to provide the most balanced and efficient staffing at the facility.   Specifically, the Ideal Schedule scans the SmartLinx comprehensive database for available nurses and recommends a list of internal and outside staff for the facility.  For example, the Ideal Schedule may recommend a more efficient and economical approach by scheduling staff from another facility rather than contacting a staffing agency.

19.     During the past year, SmartLinx has worked with other staffing agencies to roll out a new program that integrates the scheduling needs of nursing facilities with the supply of nurse staffing agencies through one interface provided by SmartLinx.  Zeif was directly involved in the development of this program.

**B.      Defendant Zeif's Hiring and Scope of Employment with SmartLinx**

19.     Zeif initially interned for SmartLinx after completing high school and was hired by SmartLinx in 2008 as Project Manager at the suggestion of his father, Alex Zeif, who is one of the founders of the Company.  Zeif's role with SmartLinx evolved over the past thirteen (13) years, from Service/Support to Product Management.  As a condition of his employment, Zeif was required to sign a series of agreements which required him to ensure and maintain security

precautions over the use of SmartLinx's confidential computer information, including its source code. Zeif was also prohibited from working for direct competitors following the conclusion of his employment, which is discussed more fully below.

20.    Throughout his employment with the Company, SmartLinx issued Zeif, among other things: (1) a Samsung Galaxy Note 9; (2) iPad; and (3) a Dell and Lenovo laptop ("SmartLinx Electronic Devices") for use in connection with his employment responsibilities.

21.    During his tenure, Zeif worked hand in hand with Plaintiff's development team in developing and enhancing SmartLinx's scheduling software application and had direct access to source code underlying the software.

22.    SmartLinx's source code is the unique and most fundamental component in the development of its scheduling software application—including the customization of software installations and development of critical features to the scheduling software application, including Ideal Schedule.  In other words, the source code is the "DNA" of SmartLinx's scheduling technology.

23.    SmartLinx's source code is not accessible to anyone outside of the company and, within the company, it is only accessible on a confidential and secured basis to those involved with its development.

24.    In early 2020, Zeif was promoted to the role of Director of Product Management, a senior level position, reporting directly to the Vice President of Product Management.

25.    Zeif's job responsibilities as Director of Product Management included:

    a.    Driving SmartLinx technology, new products and offerings, pricing strategies, and technology roadmap to insure Plaintiff's competitive advantage in the market;

    b.   Working as the face of the SmartLinx platform for both internal and external stakeholders;

    c.   Managing both strategic and tactical activities for SmartLinx's technology;

    d.   High-level interaction with SmartLinx users including focus groups, one-on-one conversations, user groups, among other methods;

    e.   Management of all market and technical problems, requirements, and system requirements;

    f.   Organizing and leading user testing programs for SmartLinx technology, including internal alpha and external beta programs; and

    g.   Working closely with the Smartlinx corporate team to establish technology budgets, activities, and investments.

26.    In his role as Director of Product Management, Zeif had access to numerous high level and key company documents, data and databases, including the SmartLinx GitHub repository containing the highly confidential source code for its scheduling software.

27.    During his employment with SmartLinx, Zeif received generous salary and bonus compensation which increased over time, ultimately exceeding a total of $1,000,000 in salary and bonus.

### C.    The SmartfLinx Agreements and Policies

28.    Because Zeif would have substantial exposure to SmartLinx's Proprietary Information and management-level proprietary data, SmartLinx required—and Zeif agreed to—several agreements and policies that mandated him to protect the SmartLinx Proprietary Information.

29.     On April 10, 2009, Zeif signed and agreed to the terms of the SmartLinx Non-Competition Agreement. (See attached **Exhibit A**).

30.     In September 2009, Zeif was promoted to the position of Director of Support and Implementation.  (See attached **Exhibit K**).  Prior to the promotion, Zeif was a Project Manager at SmartLinx.  (*See id.*)

31.     The SmartLinx Non-Competition Agreement states the following in pertinent part:

> **I will maintain appropriate personal and equipment security precautions in order to protect and maintain the confidential nature of all such materials. I specifically acknowledge the proprietary and confidential status of all customer lists customer data, requirements and development documentation, and source or object code supplied in the course of my job execution.**

32.     The SmartLinx Non-Competition Agreement also provides the following in relevant part:

> **I also commit that for a period of two (2) years beyond the conclusion of my work with SmartLinx Solutions, LLC, I will not be employed either as an employee, contractor or consultant with any entity that is directly competitive with SmartLinx Solutions, LLC.**

33.     Zeif also received and was subject to the terms and conditions of the policies and procedures contained in the SmartLinx Employee Handbook, including its Code of Conduct, Corrective Action and Personal Property & Workplace Searches policies.  (See attached **Exhibit B**).

34.     The Employee Handbook applies to all employees, including Zeif.  Among other things, under the Employee Handbook, the following behaviors are a breach of SmartLinx's Code of Conduct policy:

> **Employees are expected to exercise good judgment, good faith and loyalty to the Company in everyday performance. Each employee, alone, is responsible for his/her actions.**
>
> **Comply with all laws and regulations when conducting business on behalf of the Company.**
>
> **Exhibit respect toward co-workers, customers and /or vendors.**
>
> **Adhere to the terms of the SmartLinx Solutions, LLC "Non-Disclosure and Non-Compete Agreement" signed upon hire and maintained in their personnel file.**

35.     SmartLinx fully performed under all of the above applicable agreements and policies.

36.     The applicable agreements and policies were entered into by Zeif as a condition of his employment and for other valuable consideration.

37.     The applicable agreements and policies are fully enforceable.

**D.     Zeif's Sudden Resignation from SmartLinx**

38.     On February 12, 2021, Zeif surprised Jim Pirraglia, SmartLinx Vice President of Product, by informing Mr. Pirraglia that he was resigning from his employment with SmartLinx and would be willing to give the Company six weeks' notice of his departure.  At the time of that conversation, Zeif was evasive about his new employment situation.

39.     Thereafter, on February 14, 2021, Zeif spoke with Marina Aslanyan, SmartLinx Chief Executive Officer, and advised that he was resigning from the Company with the intent to go to work for a direct competitor of SmartLinx, Intelycare, Inc. ("Intelycare").

40.     Zeif stated that the job with Intelycare was an opportunity of a lifetime "too good to pass up" and that Intelycare wanted him "to come in and build a light version of a scheduling solution."  Indeed, Zeif was *admitting* that he would be joining a direct competitor of SmartLinx to help build up their competing scheduling application.

41.    On the same day, Zeif was reminded of his restrictive covenant obligations with SmartLinx.  Zeif denied that he had entered into any such agreement until he received an additional copy from the Company in the course of discussing his departure from SmartLinx.

42.    On information and belief, Intelycare is a Massachusetts company providing staffing and scheduling services to the healthcare industry, located at 1515 Hancock Street, #203, Quincy, Massachusetts 02169.

43.    According to its website, Intelycare is one of the fastest-growing companies in the country, has filled over three million shift hours, and is partnered with over 15,000 nursing professionals and 700 nursing facilities across the United States, and directly competes with SmartLinx for workforce management and scheduling to the healthcare industry.

44.    Intelycare directly competes with SmartLinx in the same space – the nursing and long-term care industry – and provides its own scheduling software that currently has less functionality than the SmartLinx software.

45.    On March 2, 2020, Intelycare announced the completion of their Series B funding round, totaling $45 million, with the goal to "disrupt nursing scheduling" through further development of its software solutions.  The referenced Forbes article is attached hereto as **Exhibit C**.  Zeif was aware of this funding during his interviews with Intelycare and its intended purpose to further develop software solutions in competition with those that he was intimately familiar with in his role at SmartLinx.

46.    According to the Forbes article referenced above, the "software allows nursing facilities to instantly request staff and for clinicians to take control of their schedule, potentially picking up shifts in less than 72 hours, which gives flexibility to nurses booking shifts.  An associated machine-learning algorithm also matches prices and people, and based on previous

behaviour, [Chris] Caulfield tells me that it can predict staffing-gaps before they happen, which appears to be solving problems at scale."

47.     The SmartLinx software and its Ideal Schedule feature, as discussed above, already provides a majority of these features and the new program being rolled out with staffing agencies, discussed above, will further improve and optimize the nursing scheduling industry.

48.     Intelycare's own actions also demonstrate that it actively competes with SmartLinx.  Intelycare's Google advertisements, as recent as October 2020, states the following:

> **"*Why Pay for SmartLinx? – 100% Free Scheduling Software*. Improve staff retention with mobile-friendly, transparent, and flexible scheduling options. Try our easy-to-use scheduling platform 100% free of charge. Keep your nurses smiling. 100% Free Software. Cut Agency Spend by 50%."**

> **"*Ditch Smartlinx. – 100% Free Scheduling Software* – IntelyCare.com. Improve staff retention with mobile-friendly, transparent, and flexible scheduling options. Happier staff means better patient outcomes. Give us 30 minutes and we'll give you $50. Minimal setup. Reduce Nurse Burnout. Cut Agency Spend by 50% 100% Free Software."**

49.     The above advertisements confirm that Intelycare regards SmartLinx as a competitive threat in the nursing and long-term care industry with the explicit intent to drive SmartLinx out of the market.

**E.     Zeif's Theft of SmartLinx's Confidential and Proprietary Source Code**

50.     In connection with resignation from SmartLinx to work for its direct and critical competitor, Intelycare, Zeif engaged in a systematic and strategic raid of Plaintiff's most confidential business plans and proprietary information, in violation of the confidentiality provisions of the SmartLinx Non-Disclosure and Non-Compete Agreement (the "SmartLinx Non-Competition Agreement") that he signed, as well as in violation of the DTSA, the CFAA, and the SCTSA.

51.     By hiring Zeif, Intelycare will have access to SmartLinx's confidential and proprietary information, including its scheduling software source code, that will aid the development of its competing scheduling software to "disrupt nursing scheduling" to the detriment of SmartLinx and its competitive advantage in this space.

52.     SmartLinx first learned of Zeif's unauthorized activities by performing a forensic audit of its systems and information after Zeif advised of his intention to join Intelycare. The results of the audit, which are still in progress, revealed alarming information.

53.     As early as April 2020, Zeif breached the confidentiality provisions of his SmartLinx Non-Competition Agreement by surreptitiously installing software to download the SmartLinx scheduling software source code (the "SmartLinx Proprietary Information") to his own computer. Specifically, Zeif accessed the SmartLinx GitHub repository to download approximately fifty thousand (50,000) files containing SmartLinx Proprietary Information onto his OneDrive cloud system and his computer's local C Drive.

54.     Zeif had no authorization or permission from SmartLinx to engage in this nefarious activity and none of the other SmartLinx developers engaged in the same or similar behavior. Moreover, SmartLinx developers responsible for working on the SmartLinx Proprietary Information *always* accessed the source code directly through the GitHub repository without ever downloading these files to the OneDrive or a local C Drive.

55.     Indeed, after being promoted to Director of Product Management in early 2020, Zeif was no longer responsible for coding and thus had no reason to work on SmartLinx Proprietary Information.

56.     In fact, SmartLinx expressly instructed Zeif to discontinue working on the source code. Jim Pirraglia (SmartLinx Vice President of Product and Zeif's direct supervisor) and

Marina Aslanyan (SmartLinx Chief Executive Officer) had numerous conversations with Zeif from October 2020 through and including February 2021 where they expressly instructed him not to work on the source code to ensure accountability of the development team.  He responded that he understood during those conversations and confirmed that he was.  *no longer working on the source code.*

57.    In January 2021, *after* he began the interview process with Intelycare and less than a month prior to his resignation, Zeif again performed a mass download of computer files containing the SmartLinx Proprietary Information from the GitHub repository to his OneDrive and Local C drive without the permission of SmartLinx.

58.    Zeif's illegal conduct of downloading SmartLinx Proprietary information to his OneDrive and Local C drive continued and he downloaded files on the *same days* he gave verbal and written notice of his resignation, February 14, 2021 and February 24, 2021, respectively.

59.    The majority of the file downloads occurred during non-working hours on weekends and *after* Zeif gave notice of his resignation.  A summary of the detail showing a sampling of the files is attached hereto as **Exhibit D**.

60.    Although Zeif later suggested through counsel that he had downloaded the files for work purposes to correct or fix software "bugs," the forensic audit of his work laptop computer revealed that the downloaded files were not actually being modified by him at all but rather were being locally stored on Zeif's hard drive where only he could later access them.  Moreover, a comparison of Zeif and other employees that accessed the GitHub Repository during this time revealed that *no other* employee downloaded or copied the SmartLinx Proprietary Information in the same or similar manner.

61.     During this time, Zeif also used his SmartLinx issued work phone to communicate with Intelycare and to schedule his Zoom interviews with representatives of his prospective employer.

62.     The calendar entries obtained from Zeif's work phone reflect that from January 20, 2021 through February 8, 2021—the very time period during which Zeif was downloading Smartlinx Proprietary Information—Zeif engaged in multiple Zoom calls with varying levels of Intelycare senior management, including two meetings between Zeif and the Intelycare CEO.  A summary of Zeif's calendar entries showing scheduled Zoom meetings with Intelycare is attached hereto as **Exhibit E**.

63.     The process of interviewing Zeif for a position with Intelycare (which one of the Zoom meetings indicates is for a Product Director position) occurred over short, sixteen (16) day period from January 20 to February 5, 2020, after which he was presented with an offer, with a follow up meeting on February 8th.

64.     Upon information and belief, Zeif received equity as part of the offer to join Intelycare.

65.     On February 8, 2021, Zeif texted a fellow SmartLinx employee, boasting about his decision to leave SmartLinx: "I'm gonna give them 6 weeks notice and **moonlighting** after."

66.     It follows that after providing notice to SmartLinx, Zeif had every intention to act as a faithless servant against the interests of SmartLinx, which is precisely what occurred in mid to late-February 2021 when Zeif accessed the GitHub repository to download tens of thousands of files containing the SmartLinx Proprietary Information to his local devices.

67.     Indeed, an audit of the internet searches performed by Zeif after giving notice of his resignation revealed two key indicators of his intentions to misappropriate SmartLinx source

code.  First, Zeif reviewed a software article entitled "Who Owns the Code?" which explains the issues associated with efforts of source code programmers to **reuse** code they had developed after moving to a new employer.  Second, Zeif conducted a search to determine how to create remote work access for a separate (non-SmartLinx) computer, enabling him to log into that computer and remotely access SmartLinx systems.  A true and accurate copy of these links from Zeif's Google Chrome browser and the software article is attached hereto as **Exhibit F**.

68.    Additionally, an audit of Zeif's SmartLinx devices shows that on February 13, 2021, after downloading files containing SmartLinx Proprietary Information onto his OneDrive cloud system and local C Drive, he used a series of external USB devices—used to store and transfer data from one device to another (i.e., computer to computer transfer of files)—to connect to his devices, which were not disclosed or returned to SmartLinx when his employment ended. The audit also revealed that Zeif has access to a series of external devices and platforms in addition to USB devices, including a Google Gmail address, additional phones, computers, and a Dropbox and Google Drive account linked to his SmartLinx Devices.

69.    It is the purpose of this action to enjoin Zeif's continued use and possession of SmartLinx's valuable Proprietary Information.

70.    At the time of the filing of the Verified Complaint, Zeif represented that he had not yet commenced employment with Intelycare but that he intended to do so by March 15, 2021.   To SmartLinx's knowledge, as of the date of this filing, Zeif has not yet commenced employment with Intelycare.

71.    It is further the purpose of this action to enjoin Zeif from accepting and engaging in employment with Intelycare, a direct competitor to Plaintiff.

72.    While SmartLinx's investigation is ongoing, the information already known to have been misappropriated to date comprises valuable trade secrets belonging to SmartLinx and reflects the targeted and deliberate tactics of Zeif to take the most valuable data of SmartLinx, including the source code behind its proprietary scheduling software application.

73.    The main function of the SmartLinx Proprietary Information taken by Zeif is to develop SmartLinx's proprietary scheduling software application.  Zeif's misappropriation of this SmartLinx Proprietary Information allows him to use and recreate SmartLinx's highly valuable scheduling software application and features.

74.    Zeif's theft of the SmartLinx Proprietary Information will allow a competitor, like Intelycare, to recreate SmartLinx's scheduling software application which will cause irreparable harm and significant damage SmartLinx's position in the marketplace and longstanding customer relationships.

**F.    SmartLinx Safeguards and Protects its Trade Secrets and Proprietary Information**

75.    In its operations, SmartLinx produces and maintains trade secrets and confidential information that have independent economic value.  SmartLinx has taken and continues to take appropriate steps to maintain the confidentiality of its trade secrets and confidential information, including the following:

(a)    The source code is maintained in the SmartLinx GitHub repository that only employees in SmartLinx's Information Technology department with an authorized UserID and Password can access in its native electronic form. Zeif was given user access as he was a senior-level employee of the Company and had such access removed at the time of his termination in keeping with the procedures utilized by SmartLinx.

(b)     SmartLinx requires all employees to sign multiple agreements equivalent to that signed by Zeif, including the SmartLinx Non-Competition Agreement.

(c)     Access to the subject information taken by Zeif is restricted within SmartLinx to persons of appropriate level of employment and with reason to access such information, provided such persons have executed appropriate confidentiality and non-disclosure agreements.  They are not publicly known or disclosed outside of SmartLinx.

**G.     SmartLinx Terminates Zeif For Cause And Notifies His Prospective Employer Intelycare**

76.     On February 28, 2021, SmartLinx transmitted correspondence to Zeif, terminating him for cause and directing him to immediately discontinue utilizing all electronic devices provided to him by SmartLinx during the course of his employment ("Cease and Desist Directive").  A true and correct copy of the February 28, 2021 Letter is attached hereto as **Exhibit G**.

77.     Also on February 28, 2021, SmartLinx transmitted correspondence to Intelycare, advising the company of Zeif's illegal conduct and demanding that Intelycare cease and desist all efforts to employ Zeif.

78.     SmartLinx also requested that Intelycare: (1) provide SmartLinx with a list of any and all of the Company's proprietary information, including, but not limited to, electronic and hardcopy information, computer files, source codes, and software that were provided to Intelycare by Zeif, and request that; (2) Intelycare return all SmartLinx Proprietary Information in its possession.  A true and correct copy of the February 28, 2021 Letter to Intelycare is attached hereto as **Exhibit H**.

79.    SmartLinx has learned as a result of its ongoing review of Zeif's actions in and around the time of his termination on February 28, 2021, that Zeif defied SmartLinx's Cease and Desist Directive issued to him on the same day to discontinue accessing any of his electronic devices and continued to use the machine to access source code development software and his Google Drive.  *See* attached hereto as **Exhibit J**, the Declaration of forensic expert Tino Kyprianou ("Kyprianou Decl.").

80.    In fact, the log entries indicate that he continued accessing the laptop for more than six hours after SmartLinx directed him verbally and in writing to stop working on the machine.  There is no justification for Zeif's actions with respect to SmartLinx's electronic devices following termination of employment and SmartLinx's Cease and Desist Directive.  *Id.*

81.    On March 1, 2021, SmartLinx received correspondence from John E. North, Jr., Esq. ("North"), counsel for Zeif.  A true and correct copy of the March 1, 2021 Letter from North is attached hereto as **Exhibit I**.

82.    In his correspondence, Zeif denies misappropriating SmartLinx Proprietary Information claiming that spent a significant amount of time rectifying software "bugs" brought to his attention by SmartLinx or its customers.

83.    Further, Zeif claims that he did this work for years, primarily on weekends so as not to interfere with his primary responsibilities, for the purpose of assisting his team.

84.    Indeed, Zeif admits in the North letter that this type of activity was **not part his job description** as Director of Product Management.  Moreover, in 2020, Zeif had no reason to work on the SmartLinx source code because that activity was designated to the development team.

85.    A forensic audit of the SmartLinx devices obtained from Zeif after his termination directly contradicts the statement in the North Letter that he regularly worked weekends to fix this bug problem.   Indeed, the data on the devices reveals that the bulk of this activity—downloading SmartLinx Proprietary Information from the GitHub repository to Zeif's local devices—occurred on three occasions: in April 2020, November 2020, with the majority of the activity in January and February 2021, after Zeif began to interview with Intelycare. *See* **Exhibit J**, Kyprianou Decl.

86.    The forensic audit of Zeif's devices also contradicts the statements in the North Letter that Zeif would delete the source code files from his local devices after allegedly fixing the bug problem because thousands of source code files remain on the system.  Zeif neither modified the source code nor deleted it from his local devices.  Nevertheless, SmartLinx policies and procedures prohibited any such deletion of files and information from SmartLinx devices.

87.    Zeif's misappropriation of the SmartLinx Proprietary Information was intentional, knowing, willful and malicious.

88.    Unless the Court intervenes to protect SmartLinx's Proprietary Information and to enforce the SmartLinx Non-Competition Agreement and expressly enjoins Zeif from further possession or use of such information, SmartLinx will be immediately and irreparably harmed.

89.    SmartLinx has spent hundreds of thousands of dollars in expense, person-hours, trial-and-error, and overhead dedicated to creating and maintaining the aforementioned trade secrets and confidential information.  To allow Zeif to continue his unlawful possession and use of the misappropriated confidential and proprietary information and trade secrets of SmartLinx would allow him reduce or limit SmartLinx's competitive edge

through illegal activities when it would otherwise take Zeif many years and millions of dollars for the time, labor and expense to develop and achieve its own equivalent implementation of SmartLinx's business practices.

## COUNT ONE
### Trade Secret Misappropriation Under the Federal Defend Trade Secrets Act, (18 U.S.C. § 1839, *et seq.*)

90.     SmartLinx repeats and realleges each and every allegation contained in the prior paragraphs of this Verified Amended Complaint as if fully set forth at length herein.

91.     The SmartLinx Proprietary Information contain confidential and trade secret documents and information.

92.     The SmartLinx Proprietary Information relate to services used in, or intended to be used, sold, shipped and/or ordered in, interstate or foreign commerce.

93.     SmartLinx has taken reasonable steps to protect the secrecy of the SmartLinx Proprietary Information, including the secrecy of the SmartLinx Proprietary Information that Zeif has misappropriated.

94.     Zeif has misappropriated the SmartLinx Proprietary Information in the improper and unlawful manner as alleged herein.

95.     Zeif's misappropriation of the SmartLinx Proprietary Information was intentional, knowing, willful, malicious, fraudulent, and oppressive.

96.     As a direct and proximate result of the wrongful conduct of Zeif, SmartLinx has been irreparably injured and has suffered damages.

**WHEREFORE**, Plaintiff seeks entry of judgment against Defendant Zeif pursuant to the Prayer for Relief set forth below.

## COUNT TWO
### Computer Fraud and Abuse Act

**(18 U.S.C. § 1030)**

97.    SmartLinx repeats and realleges each and every allegation contained in the prior paragraphs of this Verified Amended Complaint as if fully set forth at length herein.

98.    As alleged above, both prior to and after his termination, Zeif intentionally accessed the computer systems of SmartLinx to copy proprietary and confidential information and trade secrets in direct violation of the terms and conditions of his employment and company policy.  The access of the system by Zeif was completely unauthorized for the purpose in which he accessed the system.

99.    Zeif obtained such information from SmartLinx's protected cloud-based server system, which is connected to the Internet and is used in interstate and foreign commerce, without authorization and obtained information therefrom, in violation of 18 U.S.C. § 1030(a)(2)(C).

100.    Zeif accessed SmartLinx's computer systems with the intent to steal, deprive, and defraud SmartLinx of its computer data and records and to use those data and records for improper purposes on behalf of himself and Intelycare, to the detriment of SmartLinx.

101.    Zeif was not authorized to access the computer or database for the purpose of copying the information from the computer system, including for purposes inimical and injurious to SmartLinx and its interests following his resignation from employment.

102.    By means of this conduct, Zeif knowingly and intentionally obtained valuable proprietary and confidential information and trade secrets from SmartLinx's computer system and furthered the scheme and conspiracy with Intelycare.

103.    In taking the above actions, Zeif has damaged SmartLinx in that, among other things, Zeif has caused competitive harm to SmartLinx, and has caused SmartLinx to expend

resources to investigate the unauthorized access and to prevent such access from continuing. The losses caused by Zeif as a result exceed $5,000 within a period of one year in violation of the law including, but not limited to, 18 U.S.C. § 1030(c)(4)(A)(i)(I).

104.    As a direct and proximate result of the wrongful conduct of Zeif, SmartLinx has been irreparably injured and has suffered damages.

**WHEREFORE**, Plaintiff seeks entry of judgment against Defendant Zeif pursuant to the Prayer for Relief set forth below.

## COUNT THREE
### Trade Secret Misappropriation Under the South Carolina Trade Secrets Act (S.C. Code § 39-8-20, *et seq.*)

109.    SmartLinx repeats and realleges each and every allegation contained in the prior paragraphs of this Verified Amended Complaint as if fully set forth at length herein.

110.    The SmartLinx Proprietary Information contain confidential and trade secret documents and information.

111.    SmartLinx has taken reasonable steps to protect the secrecy of the Proprietary Information, including the secrecy of the SmartLinx Proprietary Information that Zeif has misappropriated.

112.    Zeif has misappropriated the SmartLinx Proprietary Information by acquiring same, knowing and/or having reason to know that the trade secrets were acquired by improper means, including by the breach of an express and/or implied duty to maintain the secrecy of, and/or to limit the use or disclosure of, the trade secrets.

113.    Zeif has failed to return to SmartLinx its Proprietary Information and has attempted to conceal his theft of such information.

114.    Upon information and belief, Zeif's misappropriation of the SmartLinx Proprietary Information was intentional, knowing, willful, malicious, fraudulent, and oppressive. As a direct and proximate result of the wrongful conduct of Zeif, SmartLinx has been irreparably injured and has suffered damages.

## <u>COUNT FIVE</u>
**Breach of Contract**

115.    SmartLinx repeats and realleges the allegations contained in the prior paragraphs of this Verified Amended Complaint as fully set forth at length herein.

116.    On April 10, 2009, in exchange for continued employment and other valuable consideration, Zeif entered into the SmartLinx Non-Competition Agreement which prohibited Zeif from:

    a.    Copying, removing, or downloading SmartLinx Proprietary information from its systems;

    b.    Disclosing SmartLinx Proprietary Information to anyone outside SmartLinx, during and after his employment with SmartLinx; and

    b.    Working for a competitor of SmartLinx for two (2) years after the termination of his employment with SmartLinx.

117.    Zeif breached the SmartLinx Non-Competition Agreement by:

    a.    Surreptitiously copying and downloading the SmartLinx Proprietary Information out of the SmartLinx GitHub repository and onto his OneDrive and Local C Drive;

    b.    Upon information and belief, disclosing SmartLinx Proprietary Information, including information concerning the SmartLinx scheduling software and source code, to SmartLinx's competitor, Intelycare.

c.    Accepting an offer to commence employment with Intelycare.

118.    As a direct and proximate result of Zeif's breach of the SmartLinx Non-Competition Agreement, SmartLinx has been and will continue to be damaged in an amount to be determined at trial.

**COUNT SIX**
**Misappropriation**

119.    SmartLinx repeats and realleges the allegations contained in the prior paragraphs of this Verified Amended Complaint as fully set forth at length herein.

120.    Zeif's conduct, as set forth herein, constitutes misappropriation of SmartLinx's trade secrets, being comprised of and set forth in the SmartLinx Proprietary Information.

121.    As a result of Zeif's acts of misappropriation, SmartLinx has been injured.

122.    SmartLinx has suffered and will continue to suffer irreparable harm as a result of Defendant's activities, and SmartLinx has no adequate remedy at law.

123.    As a direct and proximate result of the wrongful conduct of Zeif, SmartLinx has been irreparably injured and has suffered damages.

**WHEREFORE**, Plaintiff seeks entry of judgment against Defendant Zeif pursuant to the Prayer for Relief set forth below.

**COUNT SEVEN**
**Conversion**

124.    SmartLinx repeats and realleges the allegations contained in the prior paragraphs of this Verified Amended Complaint as fully set forth at length herein.

125.    Zeif's conduct, as set forth herein, constitutes conversion of SmartLinx's trade secrets, being comprised of and as set forth in the SmartLinx Proprietary Information.

126.    As a result of the Zeif's acts of conversion, SmartLinx has been injured.

127.   SmartLinx has suffered and will continue to suffer irreparable harm as a result of Defendant's activities, and SmartLinx has no adequate remedy at law.

128.   As a direct and proximate result of the wrongful conduct of Zeif, SmartLinx has been irreparably injured and has suffered damages.

**WHEREFORE**, Plaintiff seeks entry of judgment against Defendant Zeif pursuant to the Prayer for Relief set forth below.

**<u>COUNT EIGHT</u>**
**Breach of Fiduciary Duty and Duty of Loyalty**

129.   SmartLinx repeats and realleges each and every allegation contained in the prior paragraphs of this Verified Amended Complaint as if fully set forth at length herein.

130.   As a director of SmartLinx, Zeif owed SmartLinx a duty of loyalty and was obligated to act with the utmost good faith, and in the best interest of SmartLinx.

131.   SmartLinx was entitled to place its trust and confidence in Zeif, and was entitled to expect him to act with the utmost good faith toward it in carrying out the employment and business of SmartLinx.

132.   SmartLinx relied on the loyalty and integrity of Zeif and his faithful performance of his responsibilities.

133.   Zeif took advantage of SmartLinx's faith in him – thereby breaching his fiduciary duties – by failing to perform his duties to SmartLinx, by acting in conflict of interest, by engaging in activities for his own benefit and to the detriment of SmartLinx, and, upon information and belief, by providing the SmartLinx Proprietary Information to Intelycare.

134.   Zeif knowingly and willingly breached his duty of loyalty to SmartLinx by misappropriating SmartLinx's Proprietary Information, and engaging in acts that undermined SmartLinx's business operations.

135.    Zeif acted in a manner inconsistent with his agency and trust by misappropriating SmartLinx's Proprietary Information to the injury of SmartLinx and for his own benefit, and by acting against SmartLinx's interests while and after being employed by SmartLinx.

136.    As a direct and proximate cause of the disloyalty Zeif and breach of his duties, SmartLinx has been and is being harmed, and faces risk of irreparable harm.

137.    Zeif is still possession of the SmartLinx Proprietary Information, is able to access it, and is able to use this information to benefit other parties and to the detriment of SmartLinx.

138.    As a direct and proximate result of the wrongful conduct of Zeif, SmartLinx has been irreparably injured and has suffered damages.

**WHEREFORE**, Plaintiff seeks entry of judgment against Zeif pursuant to the Prayer for Relief set forth below.


## PRAYER FOR RELIEF

**WHEREFORE**, SmartLinx demands judgment against Zeif on all Counts of the Verified Amended Complaint that includes the entry of an Order:

A.    Temporarily, preliminary and permanently enjoining and restraining Zeif and those persons in active concert and participation with him who receive actual notice of the Court's order by personal service or otherwise, (and requiring the  Zeif to not permit any parties acting on his behalf) from any implementation, modification or customization of its business practices or operations, including without limitation its source code software based upon the SmartLinx Proprietary Information, or any other trade secrets or internal, proprietary, or confidential documents, data, or information of SmartLinx;

B.    Temporarily, preliminary and permanently enjoining and restraining Zeif and those persons in active concert and participation with him who receive actual notice of the Court's order by personal service or otherwise, (and requiring Zeif to not permit any parties acting on his behalf) from the disclosure or use of the SmartLinx Proprietary Information or any other

trade secrets or internal, proprietary, or confidential documents, data, or information of SmartLinx;

C.    Temporarily, preliminary and permanently enjoining and restraining Zeif and those persons in active concert and participation with him who receive actual notice of the Court's order by personal service or otherwise, (and requiring Zeif to not permit any parties acting on his behalf) from reproducing or otherwise using the SmartLinx Proprietary Information, and any and all internal, confidential, proprietary, and/or trade secret documents, data, and/or information belonging to SmartLinx;

D.    Temporarily, preliminary and permanently enjoining and restraining Zeif and those persons in active concert and participation with him who receive actual notice of the Court's order by personal service or otherwise, (and requiring Zeif to not permit any parties acting on his behalf) from viewing the SmartLinx Proprietary Information  or any other trade secrets or internal, proprietary, or confidential documents, data, or information of SmartLinx, in his possession which has not yet been viewed by Zeif or any persons acting on his behalf;

E.    Requiring Zeif and those persons in active concert and participation with him who receive actual notice of the Court's order by personal service or otherwise, to immediately return all records related to SmartLinx in their possession including the SmartLinx Proprietary Information , all trade secrets or internal, confidential, or Proprietary Information , data, or information belonging to SmartLinx, and any copies thereof, to SmartLinx, including but not limited to, documents, e-mails, customer lists, spreadsheets, computer files, financial information and all other information concerning SmartLinx;

F.    Requiring that Zeif and those persons in active concert and participation with him who receive actual notice of the Court's order by personal service or otherwise, immediately disclose to SmartLinx each person, including individuals and business entities, with whom they have shared SmartLinx trade secrets or internal, confidential, or Proprietary Information , data, or information (electronic or otherwise), including any and all documents, data, or information in their possession, custody or control;

G.    Directing Zeif and those persons in active concert and participation with him who receive actual notice of the Court's order by personal service or otherwise, to preserve Zeif's business and personal computers and electronic storage devices to determine the extent of information and company property that was copied from the computer network(s) of SmartLinx, and, to that end, order Zeif to (i) refrain from taking any action to destroy, discard, tamper with, or delete any electronic or written

communications, documents, materials, and any and all information in Zeif's possession, custody or control relating to the SmartLinx Proprietary Information , all trade secrets or internal, confidential, or Proprietary Information , data, or information belonging to SmartLinx, and any copies thereof;  (ii) take all steps necessary to ensure preservation of all communications in connection with the SmartLinx Proprietary Information , all trade secrets or internal, confidential, or Proprietary Information , data, or information belonging to SmartLinx, and any copies thereof, including all electronically formatted or stored documents in Zeif's possession, custody, or control, and (iii) adjust any document retention or destruction policy and all computer backup protocols to ensure the preservation of the SmartLinx Proprietary Information , all trade secrets or internal, confidential, or Proprietary Information , data, or information belonging to SmartLinx, and any copies thereof.

H.    Directing Zeif and those persons in active concert and participation with him who receive actual notice of the Court's order by personal service or otherwise, to allow SmartLinx, or its agent, access to Zeif's business and personal computers and electronic storage devices to determine the extent of information and company property that was copied from the computer network(s) of SmartLinx and/or including or related to the SmartLinx Proprietary Information.  SmartLinx will also have the right to copy any such devices at Zeif's expense;

I.    The appointment of a Special Monitor paid for by Zeif to ensure that no proprietary or confidential information of SmartLinx is used by Defendant in future;

J.    Awarding compensatory, consequential and punitive damages arising out of Zeif's conduct given that their conduct was intentional, knowing, willful, malicious, fraudulent, and oppressive;

K.    Awarding costs and counsel fees incurred in this action as required;

L.    Ordering expedited discovery; and

M.    Granting such other and further relief as this Court deems equitable and just.

Respectfully submitted,

s/  Jennifer K. Dunlap

Jennifer K. Dunlap, Esq. (SC Bar # 76031)
Email: jennidunlap@parkerpoe.com
PARKER POE ADAMS & BERNSTEIN LLP
200 Meeting Street, Suite 301
Charleston, South Carolina 29401
Phone:  843-727-2650
Fax:  843-727-2680

Howard A. Matalon, Esq.*
Alex Umanksy, Esq.*
OlenderFeldman LLP
422 Morris Avenue
Summit, New Jersey 07901

*Motion for *Pro Hac Vice* Admission to be filed

ATTORNEYS FOR PLAINTIFF SMARTLINX
SOLUTIONS, LLC

Dated:   April 5, 2021
Charleston, South Carolina

## **VERIFICATION**

Marina Aslanyan, Chief Executive Officer of Plaintiff, SmartLinx Solutions, LLC, verifies under penalty of perjury pursuant to 28 U.S.C. § 1746 that the factual statements contained in the foregoing Verified Amended Complaint are true and correct to the best of my knowledge, information and belief.

 

 

_____
Marina Aslanyan, CEO
SmartLinx Solutions, LLC

Dated:  April 5, 2021